UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| SHIRLEY A. HAYES, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 4:06 CV 1731 DDN |
| | ) |
| MICHAEL J. ASTRUE,[1] | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM

This action is before the court for judicial review of the final
decision of the defendant Commissioner of Social Security denying the
application of plaintiff Shirley A. Hayes for disability insurance
benefits under Title II of the Social Security Act (the Act), 42 U.S.C.
§ 401, et seq. The parties have consented to the exercise of plenary
authority by the undersigned United States Magistrate Judge pursuant to
28 U.S.C. § 636(c). (Doc. 7.) For the reasons set forth below, the
decision of the ALJ is affirmed.

## I.  BACKGROUND

Plaintiff Shirley A. Hayes was born on May 28, 1957. (Tr. 19.)
She is 5'1" tall with a weight that has ranged from 130 pounds to 153
pounds. (Tr. 182, 279.) She completed ten years of school and last
worked in road construction in December 2004.[2] (Tr. 133, 139.)

On April 26, 2005, Hayes applied for disability insurance benefits,
alleging she became disabled on December 3, 2004, as a result of
breathing difficulties, enlarged lymph nodes, back pain, swelling in her

---

[1]Jo Anne B. Barnhart was the original defendant. Michael J. Astrue
became the Commissioner of Social Security on February 12, 2007.
Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure,
Michael J. Astrue is substituted as defendant in this suit. 42 U.S.C.
§ 405(g).

[2]Hayes stopped working her construction job in December 2004, but
in her disability report she indicated she stopped working on April 6,
2005. The April 2005 date likely corresponds to the two days Hayes
spent picking up trash for Fred Weber Construction. (See Tr. 313-14.)

legs and feet, no hand strength, knee pain, depression, and wrist problems. (Tr. 10, 132-33.) The impairments affected her ability to breathe and limited her ability to perform manual labor and other physical activities. (Tr. 133.) The claim was initially denied on July 21, 2005. (Tr. 10.) Following a hearing on July 11, 2006, the ALJ denied benefits on August 22, 2006. (Tr. 8, 18.) On October 11, 2006, the Appeals Council denied plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 3.)

## II.  MEDICAL HISTORY

On November 27, 2001, Hayes was admitted to the emergency room, after a car struck her on the knee. The emergency room gave her Ibuprofen and pain pills. X-rays showed there was no evidence of a fracture. Dr. Carlos Pappalardo, M.D., examined her and found her knee was swollen throughout. Her knee was tender and could not flex more than twenty degrees without a lot of pain. There was no evidence of fluid in the joint itself. Dr. Pappalardo diagnosed her with a knee contusion and prescribed pain medication and Ibuprofen, and assigned her to a sitting job only.[3]  (Tr. 160.)

On November 30, 2001, Hayes saw Dr. Lewis Fischer, M.D., for a follow-up of her knee pain. Hayes had edema and purpura of the medial anterior right knee.[4] She had full extension, but could flex only to thirty degrees. She limped and could not squat. Dr. Fischer diagnosed her with a right knee contusion, but "there is no suggestion of permanency. Causation is believed to be work-related." Dr. Fischer prescribed her Vicodin, but without refills.[5]  (Tr. 161.)

_____

[3]A contusion is any injury in which the skin is not broken. Stedman's Medical Dictionary, 348 (25th ed., Williams & Wilkins 1990).

[4]Edema is an accumulation of watery fluid in cells, tissues, or cavities.  Stedman's Medical Dictionary, 489.  Purpura is a condition characterized by hemorrhage into the skin.  Id., 1294.

[5]Vicodin is a combination narcotic and non-narcotic, and is used to relieve moderate to severe pain.  http://www.webmd.com/drugs. (Last visited February 19, 2008).

On December 6, 2001, Hayes saw Dr. Fischer, complaining that her right knee was unstable and would go out when walking. She could barely walk and could not bend at the knee. A physical examination showed tenderness of the medial collateral ligaments of the right knee, with pain on manipulation. Her knee appeared "obviously unstable." Dr. Fischer diagnosed Hayes with probable internal derangement of the right knee and gave her crutches. He assigned her to sit-down work only. (Tr. 162.)

On December 7, 2001, Hayes saw Lisa Akers, FNP. Hayes had limited range of motion because of the pain, but no edema was noted. She had full range of motion in the foot. A drawer test was negative and Homans' sign was negative.[6] An MRI revealed a tear of the medial collateral ligament and a very small amount of joint effusion.[7] The medial and lateral menisci, and the lateral collateral ligament all appeared intact. Hayes was to be sent to an orthopedic specialist. She was to continue wearing her brace and was taken off work. Akers did not prescribe any medication. (Tr. 163, 171.)

On December 15, 2001, Dr. Robert Markenson, M.D., performed an arthroscopic partial synovectomy to repair the medial collateral ligament.[8] During the surgery, Dr. Markenson noted the meniscus was intact and there was no evidence of chondromalacia.[9] After the surgery, Hayes was returned to the recovery room, in stable condition. (Tr. 145-46.) On December 20, 2001, Dr. Markenson sent Hayes to physical therapy

---

[6]A drawer test is used to detect a rupture of the cruciate ligaments in the knee. Homans' sign is characterized by slight pain at the back of the knee or calf when the ankle is flexed. Homans' sign is indicative of clotting in the veins of the leg. Stedman's Medical Dictionary, 1420.

[7]Effusion is the escape of fluid from the blood vessels into the tissues or into a cavity. Stedman's Medical Dictionary, 491.

[8]A synovectomy is the surgical removal of the membrane of a joint. Stedman's Medical Dictionary, 1541.

[9]Chondromalacia is the softening of any cartilage. Stedman's Medical Dictionary, 298.

and explained that Hayes was unable to return to work until further notice.  (Tr. 156.)

On January 18, 2002, Dr. Markenson noted that Hayes's knee was doing better and appeared fairly stable.  He recommended continuing physical therapy, but believed she could discontinue the brace.  He also believed she could drive, but was limited to sedentary work.  Her flexion was 110 to 115 degrees.  (Tr. 148, 157.)

On February 11, 2002, Dr. Markenson noted Hayes was making slow, but steady progress with her knee.  She had increased her activities and Dr. Markenson believed Hayes could drive, lift between five and ten pounds, and work in a standing position.  He noted she should avoid uneven ground and kneeling or squatting, but could otherwise perform light duty work.  (Tr. 149, 158.)

On May 20, 2002, Dr. Markenson noted Hayes was having mild discomfort in her knee, but "has been able to work without too much difficulty."  Her range of motion was within five to ten degrees of full flexion.  Dr. Markenson assigned her a 10% permanent disability of the right lower extremity.  Hayes was able to return to full duty work without restrictions.  (Tr. 153, 155.)

On February 13, 2003, Hayes reached a settlement over her worker's compensation claim with her employer, Fred Weber Construction.  Hayes was injured on November 27, 2001.  (Tr. 61.)

On May 27, 2004, Hayes underwent an MRI of her spine.  The MRI revealed no evidence of a herniated disk or spinal stenosis.[10]  There was a reversal of the normal cervical curvature, and there was a minimal joint spur at C5-6, with mild foraminal encroachment.[11]  (Tr. 295.)

_____

[10]A herniated disk is a protruded or ruptured disk.  The protrusion will compress the nerve root or the cauda equina.  Stedman's Medical Dictionary, 260, 455.  The cauda equina is a collection of nerves below the end of the spinal cord, which travel down the thecal sac and go to the muscles and skin.  http://www.neurosurgerytoday.org.  Stenosis is the narrowing or constriction of any canal.  Stedman's Medical Dictionary, 1473.

[11]The human spinal column consists of thirty-three vertebrae.  There are seven cervical vertebrae (denoted C1-C7), twelve thoracic vertebrae (denoted T1-T12), five lumbar vertebrae (denoted L1-L5), five

(continued...)

On October 13, 2004, Hayes underwent a CT scan of her chest. The scan revealed no signs of masses or adenopathy.[12] A couple of small mediastinal nodes were unchanged since a previous scan on March 2, 2004.[13] (Tr. 284.)

On March 28, 2005, Hayes underwent a CT scan of her hands. She had complained of hand pain for the previous three months, and had been unable to grip things. The scan revealed the soft tissues for each hand were normal, and there were no fractures, dislocations, or other abnormal bone production in either hand. (Tr. 245.)

On April 28, 2005, Hayes described the impairments that prevented her from working. She was unable to breathe, suffered from back pain, swelling in her feet and legs, had no grip in her hands, had pain in her hands, and had enlarged lymph nodes which impaired her breathing. She was unable to exert herself without extreme breathing difficulties. She noted a knee injury from an automobile accident, and wrist problems as well. The tendons in her hands had been damaged from years of shoveling, hammering, and other physical activities associated with her work. (Tr. 21.)

On May 12, 2005, Hayes completed a work history report. From April 1989 to December 2004, Hayes worked in road construction. She worked eight to ten hours a day, five to six days a week. As part of her job, Hayes shoveled asphalt, directed highway traffic, carried barrels and barriers, ran a road mill, and walked along construction machines. She

_____

[11](...continued)
sacral vertebrae (denoted S1-S5 and fused together into one bone, the sacrum), and four coccygeal vertebrae (fused together into one bone, the coccyx). The cervical vertebrae form part of the neck, while the lumbar vertebrae form part of the lower back. The sacrum is immediately below the lumbar vertebrae. Stedman's Medical Dictionary, 226, 831, 1376, 1549, 1710, Plate 2. A spur, or calcar, is a small projection from a bone. Id., 227. A foramen is a perforation through a bone or a membranous structure. Id., 605.

[12]Adenopathy is swelling or morbid enlargement of the lymph nodes. Stedman's Medical Dictionary, 26.

[13]Mediastinal relates to the part of the thorax containing the heart, aorta, other large blood vessels, oesophagus, and some other organs. http://www.medcyclopaedia.com (Last visited February 19, 2008).

would walk, stand, stoop, kneel, crouch, and handle and grasp objects for eight to ten hours a day. She would occasionally lift a hundred pounds or more, and frequently lift fifty pounds or more. She stopped working when she was fired. Her employer said there was no more work. (Tr. 108-15, 124-31, 133.)

On May 12, 2005, Hayes completed a function report. In a typical day, she would make coffee and breakfast, clean the house, feed the animals, run errands, shower, cook dinner, clean dishes, pick up things around the house, do laundry, and then go to bed. She cared for the pets, feeding them, getting them exercise, and cleaning the filters, pumps, and other equipment. Because of her impairments, any activities required her to take frequent breaks. She was walking less and had to rest often. She cooked complete meals, every day, but the meals took longer to prepare, and she needed frequent breaks. She was able to mow the lawn on a riding mower and clean the bathroom. Hayes would go out daily, could drive a car, and could go out alone. She shopped, two to three times a week, in stores and by mail, and bought food, clothes, household items, yard supplies, and pet supplies. (Tr. 74-78.)

Hayes gardened, but digging made her short of breath, and sometimes she was unable to pull the weeds. Two to three times a week, she would go shopping, or go to her sister's or friend's home. In the report, Hayes stated that her impairments affected her ability to lift, squat, bend, stand, reach, walk, sit, kneel, talk, climb stairs, complete tasks, and use her hands. Her back pain limited her lifting, her knee hurt when squatting, her feet and legs hurt when standing or walking, and climbing stairs made her short of breath. She could walk no farther than one block, before requiring fifteen to twenty minutes of rest. She feared losing her home because of financial difficulties, and would become moody or angry over minor things. In the summer months, Hayes would struggle to breathe, become dizzy, and sometimes pass out. It was almost impossible for Hayes to do any outside activity when it was hot. (Tr. 78-81.)

On June 16, 2005, Dr. Arthur Greenberg, M.D., examined Hayes. Dr. Greenberg noted Hayes's complaints of breathing problems, back pain, swelling in her legs and feet, hand problems, and knee problems. A

physical examination showed her breathing was not labored, her lungs were clear, and she had no rubs, wheezes, rales, or rhonchi.[14] Her chest was clear to percussion and there was no clubbing or cyanosis.[15] Her hands were free of deformities, nodes, and any swelling or tenderness. Her grip strength was normal and she was able to pick up coins with her hands. Her lower extremities showed no tenderness, swelling, or edema. There was no loss of range of motion or pain associated with movement, and her gait was normal. Hayes did have some stiffness and reduced range of motion in her right knee. There was no tenderness or percussion in the cervical or dorsolumbar spine, and her neck showed normal range of motion. Hayes could walk on her toes, could squat without difficulty, and get on and off the table with no significant difficulty. Testing for Tinnel's sign was negative.[16] (Tr. 248-54.)

On July 13, 2005, Dr. Joan Singer, Ph.D., completed a psychiatric review technique. Dr. Singer found Hayes's impairments not severe, but noted Hayes suffered from anxiety-related disorders. Dr. Singer found Hayes's impairments did not restrict any of her daily activities, affect her social functioning, or affect her concentration. There were no episodes of decompensation. Dr. Singer noted that Hayes "does not allege psych[iatric] problems," but suffered from anxiety. Dr. Singer found Hayes's intellectual functioning and memory were good. Hayes had a lot of physical complaints, which could reasonably contribute to her anxiety. Dr. Singer found Hayes credible, but found her psychiatric impairment non-severe. (Tr. 94-106.)

On July 18, 2005, Barbara Huffman, a disability examiner, completed a physical residual functional capacity assessment of Hayes. Huffman noted the primary diagnosis was osteoarthritis of the cervical spine,

_____

[14]Rhonchi are breathing sounds that would indicate inflammation of the lungs. Stedman's Medical Dictionary, 1361.

[15]Clubbing is the broadening of the fingers or toes. Stedman's Medical Dictionary, 320. Cyanosis occurs when the skin becomes purple and blue due to deficient oxygenation of the blood. Id., 383.

[16]Tinel's sign is a sensation of tingling, or of "pins and needles," felt in the distal extremity of a limb, when percussion is made over the site of an injured nerve. Stedman's Medical Dictionary, 1422.

with mild foraminal encroachment.  Hayes also allegedly suffered from breathing problems, and problems with her knees, feet, legs, wrist, and hands.  After considering the medical evidence and Hayes's daily activities, Huffman concluded that Hayes could occasionally lift fifty pounds, frequently lift twenty-five pounds, could sit, stand, and/or walk for six hours in an eight-hour workday, and perform an unlimited amount of pushing and pulling.  She had no postural, manipulative, visual, communicative, or environmental limitations.  (Tr. 86-93.)

On August 11, 2005, Hayes saw Dr. Subramanian Paranjothi, M.D., complaining of cough and shortness of breath.  A physical examination showed her chest had symmetric expansion and her respiratory effect was normal.  Percussion, palpation, and breathing sounds were also normal. There were no rubs, wheezes, or crackles.  She appeared oriented and had a pleasant disposition.  Dr. Paranjothi diagnosed her with dyspnea, possibly from obstructive lung disease, and lymphadenopathy with possible postinflammatory fibrosis.[17]  Dr. Paranjothi recommended a CT scan of her chest, that she continue with her medications, and that she quit smoking.  (Tr. 235-37.)

On August 22, 2005, Hayes underwent a CT scan of her chest.  The scan revealed enlarged lymph nodes and the peripheral lung showed diffuse emphysematous changes.[18]  There was no evidence of adenopathy. (Tr. 233.)  That same day, Hayes underwent a pulmonary function test, to test for dyspnea.  Her carbon monoxide diffusing capacity (DLCO) and forced mid-expiratory flow rate (FEF) 25-75% were moderately decreased. Her other values were normal.  Hayes noted smoking one and a half packs a day, for the last twenty years.  She was still smoking at the time of the test.  (Tr. 242-43.)

---

[17]Dyspnea is shortness of breath, usually associated with a disease of the heart or lungs.  Stedman's Medical Dictionary, 480. Lymphadenopathy is any disease process affecting a lymph node.  Id., 900.  Fibrosis is the formation of fibrous tissue as part of a reparative process.  Id., 583.

[18]Emphysema is a lung condition characterized by destructive changes to the alveoli or air sacs, and produces undue breathlessness on exertion.  Stedman's Medical Dictionary, 504.

On October 17, 2005, Hayes saw Richard DiValerio, M.D., complaining of hand pain. Dr. DiValerio examined Hayes and found no signs of bony erosion or destruction, but noted mild osteoarthritis bilaterally at the metacarpal joints.[19] (Tr. 190.) A physical examination showed no acute swelling or warmth in the wrists, elbows, shoulders, hips, knees, ankles, or feet. Hayes appeared awake, alert, and oriented, and had normal motor strength. Her lungs were clear, her heart rate and rhythm were normal, her abdomen was nontender, and she had no edema. (Tr. 188.) At the time, she was taking Aciphex, Advair, Albuterol, Allegra, Celebrex, Combivent, Singulair, Ultracet, and Wellbutrin.[20] (Tr. 187.)

On November 2, 2005, Hayes saw Dr. DiValerio, complaining of hand pain, ankle pain, and swelling in her knuckles. A physical examination showed no swelling or tenderness in her hands or wrists. He diagnosed Hayes with polyarthropathy.[21] (Tr. 186.)

On December 15, 2005, Hayes saw Dr. DiValerio. She said her hands were feeling better, but her feet were sore. She also complained of constant right elbow pain. A physical examination showed no swelling or tenderness in her hands or wrists. (Tr. 182.)

On January 17, 2006, Hayes saw W. Edward Turner, M.D., M.S., for a psychosocial evaluation. She was increasingly depressed because she was unable to work as a construction laborer due to emphysema and arthritis, and had financial worries from being out of work. During the evaluation, she was well-groomed, cooperative, and calm. Her mood was depressed but her speech was normal. She denied any delusions, hallucinations, or suicidal thoughts. Her thought process was intact

---

[19]The metacarpi are the five bones of the hand between the carpus and the phalanges. Stedman's Medical Dictionary, 952.

[20]Aciphex is used to treat acid-related stomach problems. Advair, Albuterol, and Combivent are used to treat wheezing and shortness of breath, caused by asthma or lung disease. Allegra is an antihistamine and decongestant. Celebrex is an anti-inflammatory drug used to treat arthritis. Singulair is used to treat or prevent asthma. Ultracet is used to treat pain, particularly short term pain. Wellbutrin is an antidepressant used to treat depression and mood disorders. http://www.webmd.com/drugs. (Last visited February 19, 2008).

[21]Arthropathy is any disease affecting a joint. Stedman's Medical Dictionary, 136.

and her concentration and judgment were fair. Dr. Turner noted she was intelligent. She was diagnosed with major depression and assigned a GAF of 50–55.[22] (Tr. 218-20.)

On January 26, 2006, Hayes saw Gene Davis, M.D. Dr. Davis examined Hayes's right elbow and found no joint effusion or any evidence of fluid in the bursa. There was also no evidence of erosive arthropathic changes. (Tr. 181.)

On February 20, 2006, Hayes underwent a CT scan of her chest. The scan showed the lungs were clear of infiltrates and effusions, there were no masses, but continued adenopathy and emphysematous changes. There were no new cardiopulmonary diseases since the last exam on August 22, 2005. (Tr. 227-28.)

On February 20, 2006, Hayes saw Dr. Turner for a psychiatric care evaluation. The evaluation showed she was having trouble sleeping, her mood was low, but she was having fewer crying spells. Her appearance was good, and her speech was coherent, spontaneous, and relevant. Her mood was mildly depressed with feelings of hopelessness. She was oriented and had no hallucinations or thoughts of homicide or suicide. She was diagnosed with major depression. (Tr. 216.)

On March 21, 2006, Dr. Turner completed a mental residual functional capacity questionnaire. He diagnosed her with major depressive disorder and assigned her a GAF of 55. At the time, Hayes was taking Wellbutrin, Effexor, and Trazodone.[23] Dr. Turner noted Hayes was irritable and had a depressed mood. She experienced crying spells, insomnia, feelings of helplessness and hopelessness, lack of energy, and

---

[22]A GAF score, short for Global Assessment of Functioning, helps summarize a patient's overall ability to function. A GAF score has two components. The first component covers symptom severity and the second component covers functioning. A patient's GAF score represents the worst of the two components. On the GAF scale, a score of 55 represents moderate symptoms (such as flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (such as few friends, conflicts with peers or co-workers). Diagnostic and Statistical Manual of Mental Disorders, 32-34 (4th ed., American Psychiatric Association 2000).

[23]Effexor and Trazodone are used to treat depression. http://www.webmd.com/drugs. (Last visited February 19, 2008).

lack of motivation. She expressed frustration with her current circumstances. Dr. Turner believed Hayes would be unable to complete a normal workday and workweek without interruptions from her psychologically based symptoms, would be unable to perform at a consistent pace without an unreasonable number of breaks, and would be unable to deal with normal work stress. Dr. Turner believed Hayes would be seriously limited in her ability to get along with co-workers. Dr. Turner also believed Hayes lacked the mental abilities and aptitudes to perform semi-skilled and skilled work. He believed she would be unable to understand detailed instructions, carry out detailed instructions, and deal with the stress of semi-skilled and skilled work. He did not believe Hayes had a low IQ or reduced intellectual functioning. (Tr. 221-25.)

On March 23, 2006, Hayes saw Dr. DiValerio for an appointment. The notes indicate she was applying for disability. A physical examination showed no swelling or tenderness in her hands, wrists, elbows, shoulders, knees, or ankles. A pulmonary examination showed normal respiratory effort, and that her lungs were clear. (Tr. 179.)

On March 23, 2006, Dr. DiValerio completed a physical residual functional capacity questionnaire for Hayes. He noted Hayes suffered from polyarthritis, with fatigue and joint pain in the feet, hands, elbows, and right shoulder. Hayes was not a malingerer and also suffered from depression and cognitive dysfunction. He believed Hayes was incapable of working even low stress jobs because of her cognitive dysfunction and musculoskeletal symptoms. He estimated Hayes could walk no farther than fifty feet, could sit for no more than five minutes at a time, and could not stand. He believed Hayes could sit and stand/walk for less than two hours in an eight-hour workday, and would require ten-minute breaks every thirty to sixty minutes. Hayes could rarely lift less than ten pounds, and could never lift ten pounds or more. She could not twist, stoop, crouch, or climb ladders or stairs. She could not use her fingers or hands for more than ten percent of a day. Dr. DiValerio believed Hayes would miss more than four days of work a month, because of her impairments. (Tr. 195-99.)

On April 24, 2006, Hayes saw Dr. DiValerio, for a follow-up. She reported doing better, but was still on Vicodin. She noted pain in her hands, elbows, and knees. A physical examination showed no swelling or tenderness in the hands, wrists, shoulders, knees, and ankles. Hayes was to return in three months. (Tr. 178.)

On May 18, 2006, Hayes saw Dr. Turner for a psychiatric consultation. She noted feeling less depressed. Dr. Turner found her appearance was average, and her speech was coherent and spontaneous. Her mood was mildly depressed and absent. She had no suicidal or homicidal thoughts, and was sleeping well. Her anxiety was free-floating, but decreased. She was oriented, had no hallucinations, had normal memory and insight, and had good judgment. (Tr. 176.)

On May 30, 2006, Dr. Paranjothi administered a CT scan of Hayes's chest. The scan showed a mildly progressive mediastinal and bilateral hilar adenopathy.[24] A subcarinal and aortopulmonary lymph node were present. There were no pericardial or pleural effusions.[25] The lungs showed moderate emphysematous change. Dr. Paranjothi diagnosed Hayes with mildly progressive mediastinal and bilateral hilar lymphadenopathy, moderate emphysema, and mild dependent atelectasis.[26] (Tr. 174.)

On June 5, 2006, Hayes saw Dr. Paranjothi, complaining of abdominal pain, depression and anxiety, insomnia, cough, shortness of breath, and weakness. Dr. Paranjothi diagnosed Hayes with chronic obstructive pulmonary disease (COPD), lymphadenopathy, and insomnia. (Tr. 175.)

---

[24]The hilum is the part of an organ where the nerves and vessels enter and leave. Stedman's Medical Dictionary, 716.

[25]The pericardium is the membrane enveloping the heart. Stedman's Medical Dictionary, 1163. The pleura are the serous membranes enveloping the lungs and lining the walls of the pleural cavity. Id., 1215.

[26]Atelectasis is the absence of gas from a part or the whole of the lungs, from the failure of expansion or resorption of gas from the alveoli. Stedman's Medical Dictionary, 147.

On June 9, 2006, Louis Stickley, M.D., administered a Bruce Protocol Stress Test.[27] Hayes completed a total of 10 minutes and 32 seconds of exercise, reaching a heart rate of 147 beats per minute, which was 86% of her maximal predicted heart rate. While exercising, Hayes had no chest pain, no arrhythmia, and no evidence of myocardial ischemia.[28] The test produced normal results. (Tr. 173.)

On July 3, 2006, Hayes was taking Abreva and Valtrex for cold sores, Advair, Albuterol, and Spiriva Handihaler for emphysema, Allegra and Singulair for allergies, Antivert for vertigo, Dolobid for arthritis, Mucinex for congestion, Nexium for indigestion, and Trazodone for sleeplessness. (Tr. 71-72.)

**Testimony at the Hearing**

At the hearing on July 11, 2006, Hayes described her ailments and work history. She said she was unable to do her job because she could not breathe. She can drive, but her hands go numb after holding the steering wheel for thirty or sixty minutes. While she worked for Fred Weber, Hayes worked with machines, flagged, and shoveled asphalt. As part of the job, she would lift fifty to a hundred pounds. She would also stand for long periods of time. Hayes was no longer able to do her job because her legs and feet would swell if she stood for too long, she was unable to grip with her hands, and she had difficulty breathing. (Tr. 304-13.)

In December 2004, Hayes was fired from her construction job because there was no more work. She applied for unemployment benefits, which was typical, because she was usually laid off in the wintertime and re-hired in the Spring. After December 2004, Hayes worked for Fred Weber for two days picking up trash. There was no further work after the two

---

[27]The Bruce Protocol Stress Test involves exercise performed on a treadmill, and is used to test cardiovascular function. http://www.topendsports.com/testing/tests/bruce.htm (last viewed February 25, 2008).

[28]Arrhythmia is an irregular heart beat. _Stedman's Medical Dictionary_, 120. Ischemia is local anemia due to mechanical obstruction (mainly arterial narrowing) of the blood supply. _Id._, 803.

-13-

days, but Hayes believed she would not have been able to pick up trash full-time, because her knee would give out when walking up the hills, and her legs and feet were throbbing by the end of the day. (Tr. 313-14.)

Hayes did not believe she could perform a sitting job. Her legs and back would get stiff from sitting too long. She could sit for no longer than five or ten minutes before needing to get up. Her neck and shoulder hurt as well, stemming from a car accident in 1980. She took pain pills for her back, but did not get treatment. She had trouble gripping things with her hands; if she held something for too long, her hands would cramp. (Tr. 314-18.)

Hayes had emphysema, which required her to use an Albuterol inhaler, three to four times a day. Hayes had tried to quit smoking, but was unable to quit completely. She was only able to reduce the amount she smoked to a little more than a pack a day. Hayes suffered from anxiety and depression, and would have a panic attack once every two or three months. Her financial and physical concerns caused her stress. She also had crying spells once or twice a week. The medication was helping with her depression. (Tr. 318-22.)

Hayes did not have any problems caring for her personal hygiene, but noted it took her longer than before. She did the housework, which included vacuuming, dusting, cleaning dishes, cleaning the bathrooms, doing laundry, cooking, and mopping. Her arm, elbow, and shoulder would hurt when vacuuming, and her hands hurt when cleaning the bathroom. She could only clean the bathroom for ten minutes at a time. When she went grocery shopping she would lean on the cart to relieve her foot pain. She could lift up to ten pounds with her left arm. Hayes had knee problems, and once every couple of months her knee would give out. The pain in her right knee was constant, even while sitting, and was about 3/10. Her back pain was also 3/10. Hayes took pain medication about once a day to help relieve her knee and back pain. (Tr. 322-28.)

Hayes spent her time watching television. She used to garden, but her hands hurt too much to pull the weeds and bending over was also difficult. Hayes believed she could not sit in the same place for more than twenty minutes before needing to get up and could not stand in the

same place for more than forty-five minutes before her back would start
hurting.  She could walk no farther than to the mailbox.  (Tr. 328-33.)

### III.  DECISION OF THE ALJ

The ALJ found that Hayes suffered from arthritis, emphysema, and
depression, and that these impairments were severe.  At the same time,
the ALJ found that these impairments were not disabling, and that Hayes
retained the residual functional capacity (RFC) to lift up to ten pounds
at a time, sit for six hours in an eight-hour workday, and walk and
stand for up to two hours in an eight-hour workday.  (Tr. 12.)

In making this determination, the ALJ considered Hayes's alleged
impairments and the relevant medical evidence.  Hayes alleged disability
due to breathing problems, which limited her ability to exert herself.
She also complained of wrist problems, back pain, no grip in her hands,
right knee problems, depression, and swelling in her feet and legs.  In
December 2001, Hayes had knee surgery, but was able to return to work
in April 2002, without restrictions.  In June 2005, Dr. Greenberg found
Hayes's breathing was not labored and her lungs had no rubs, wheezes,
rales, or rhonchi.  In August 2005, Dr. Paranjothi conducted a pulmonary
function test and found moderate diffusion.  The doctor recommended that
Hayes stop smoking.  In October 2005, Dr. DiValerio found significant
swelling and arthritis, and believed Hayes was extremely limited.  In
March 2006, Dr. Turner diagnosed Hayes with major depression, emphysema,
and arthritis.  He assigned Hayes a GAF score of 55.  (Tr. 13-15.)

After reviewing the medical evidence, the ALJ found Hayes's
statements concerning the intensity, persistence, and effects of her
symptoms not completely credible.  The ALJ also discredited the opinion
of Dr. DiValerio, finding his medical notes did not support the
conclusions in his report.  "There is no supporting documentation to
find the claimant limited to the extent as shown in this report."  The
ALJ noted that Hayes's daily activities conflicted with Dr. DiValerio's
conclusions and her own allegations of disabling symptoms.  In addition,
Hayes had applied for unemployment benefits, indicating she intended to
return to work.  Hayes never required surgery or prolonged
hospitalization.  She continued to smoke, despite her doctors'

recommendations.  Hayes did not seek psychiatric treatment until January 2006.  For these reasons, the ALJ concluded Hayes's problems were only moderate.  In reaching this conclusion, the ALJ favored the opinions of Dr. Greenberg over the opinions of Dr. DiValerio and Dr. Turner. Considering Hayes's age, education, work experience, and RFC, the ALJ found that Hayes could perform a significant number of jobs in the national economy.  In particular, the ALJ found Hayes could perform the full range of sedentary jobs.  She was therefore not disabled within the meaning of the Social Security Act.  (Tr. 15-18.)

## IV.  GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings are supported by substantial evidence in the record as a whole.  Pelkey v. Barnhart, 433 F.3d 575, 577 (8th Cir. 2006).  "Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion."  Id.  In determining whether the evidence is substantial, the court considers evidence that detracts from, as well as supports, the Commissioner's decision.  See Prosch v. Apfel, 201 F.3d 1010, 1012 (8th Cir. 2000).  As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently.  See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least 12 months.  See 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A).  A five-step regulatory framework governs the evaluation of disability in general. See 20 C.F.R. § 404.1520; see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing the five-step process); Fastner v. Barnhart, 324 F.3d 981, 983-84 (8th Cir. 2003).  If the Commissioner finds that a claimant is disabled or not disabled at any step, a decision is made and the next step is not reached. 20 C.F.R. § 404.1520(a)(4).

In this case, the Commissioner determined that Hayes lacked the RFC to perform her past work, but could still perform the full range of sedentary jobs.

## V. DISCUSSION

Hayes argues the ALJ's decision is not supported by substantial evidence. First, Hayes argues the ALJ improperly relied on the Medical-Vocational Guidelines and should have called a vocational expert. Second, Hayes argues the ALJ failed to properly weigh the opinion evidence. Third, Hayes argues the ALJ failed to fully and fairly develop the record and should have recontacted the treating doctors if he perceived there were ambiguities in their opinions. Finally, Hayes argues the ALJ improperly considered her receipt of unemployment benefits. (Doc. 11.)

**Vocational Expert Testimony**

When the ALJ determines that a claimant cannot perform past relevant work, the burden shifts to the Commissioner to prove there is work in the national economy that the claimant can perform. Ellis v. Barnhart, 392 F.3d 988, 993 (8th Cir. 2005); 20 C.F.R. § 404.1560(c). If the ALJ finds the claimant has only exertional impairments, the Commissioner may meet this burden by referring to the Medical-Vocational Guidelines. Robinson v. Sullivan, 956 F.2d 836, 841 (8th Cir. 1992). If the ALJ finds the claimant suffers from a nonexertional impairment, the Commissioner may meet this burden by consulting the Guidelines only in certain circumstances. See Thompson v. Astrue, 226 F. App'x 617, 621 (8th Cir. 2007); Sanders v. Sullivan, 983 F.2d 822, 823 (8th Cir. 1992). "An ALJ may use the Guidelines even though there is a nonexertional impairment if the ALJ finds . . . that the nonexertional impairment does not diminish the claimant's residual functional capacity to perform the full range of activities listed in the Guidelines." Thompson, 226 F. App'x at 621. The medical record must support the ALJ's finding. Id.

On the other hand, if the ALJ finds the claimant has nonexertional impairments, and these impairments diminish the claimant's capacity to perform the full range of jobs listed in the Medical-Vocational

Guidelines, the Commissioner must solicit testimony from a vocational expert to show the claimant has the capacity to perform work in the national economy. Robinson, 956 F.2d at 841. A nonexertional impairment is any limitation, besides strength, which reduces an individual's ability to work. Sanders, 983 F.2d at 823. Pain and mental impairments are two such limitations. See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

In this case, the ALJ found Hayes's subjective complaints of pain were not completely credible. Instead, the ALJ found that Hayes's physical and mental limitations were not disabling, and that she had the RFC to perform the full range of sedentary work under the Guidelines. Under Thompson, the ALJ was not required to solicit vocational expert testimony, if the medical record supports this finding. See Thomspon, 226 F. App'x at 621.

Substantial medical evidence supports the ALJ's determination that Hayes's complaints of pain were not completely credible and that she had the RFC to perform the full range of sedentary work. In November 2001, a car struck Hayes on the knee. In February 2002, Dr. Markenson told her she could drive, work in a standing position, and otherwise perform light duty work. In May 2002, Hayes was able to return to full duty work without restrictions. Indeed, Hayes continued to work until December 2004, when there was no more work for her. See Goff v. Barnhart, 421 F.3d 785, 792 (8th Cir. 2005) ("Working generally demonstrates an ability to perform a substantial gainful activity.").

In May 2004, an MRI of Hayes's spine showed no evidence of a herniated disk or spinal stenosis. In October 2004, a CT scan of Hayes's chest showed no signs of masses or adenopathy. In March 2005, a CT scan of Hayes's hands revealed the soft tissues of each hand were normal, and there were no fractures, dislocations, or other abnormal bone productions in either hand. In May 2005, Hayes listed a number of daily activities she was still able to perform. She could make breakfast, clean the house, feed the animals, run errands, shower, cook dinner, clean dishes, do laundry, drive a car, and go out alone. See Roberson v. Astrue, 481 F.3d 1020, 1025 (8th Cir. 2007) (caring for child, driving, fixing simple meals, doing housework, and shopping for

groceries did not support claimant's alleged inability to work); see also Casey v. Astrue, 503 F.3d 687, 696 (8th Cir. 2007) ("[I]nconsistencies between subjective complaints of pain and daily living patterns may diminish credibility.").

In June 2005, Dr. Greenberg found Hayes's breathing was not labored, her lungs were clear, and she had no rubs, wheezes, rales, or rhonchi. Her chest was clear, her hands were free of deformities, swelling, and tenderness, and she had normal grip strength. In July 2005, Dr. Singer found Hayes's mental impairments were not severe and did not restrict any of her daily activities. In fact, Hayes was not even alleging that she had psychiatric problems. In August 2005, Dr. Paranjothi found Hayes had normal respiration, with normal percussion, palpation, and breathing sounds, but dyspnea. She also appeared oriented. That same month, a CT scan of her chest showed no adenopathy. In October 2005, Dr. DiValerio found Hayes had no swelling or warmth in the wrists, elbows, shoulders, hips, knees, ankles, or feet. He also found her awake, alert, and oriented, with normal motor strength and clear lungs.

In January 2006, Dr. Turner found Hayes's thought process was intact and her concentration and judgment were fair. He found her intelligent and assigned her a GAF score that correlated with moderate symptoms. That same month, Dr. Davis found no effusion in Hayes's elbow. In March 2006, Dr. DiValerio found Hayes had normal respiratory effort and clear lungs. In April 2006, Dr. DiValerio found Hayes had no swelling or tenderness in her hands, wrists, shoulders, knees, or ankles. In May 2006, Dr. Turner found Hayes was sleeping well, had no homicidal or suicidal thoughts, was oriented, had normal memory and insight, and had good judgment. At the hearing in July 2006, Hayes testified that she could vacuum, dust, mop, clean dishes, clean the bathrooms, do laundry, cook, and lift up to ten pounds with one arm. Finally, Hayes continued to smoke at least a pack a day, despite the advice of her doctors. See Wheeler v. Apfel, 224 F.3d 891, 895 (8th Cir. 2000) (The ALJ properly considered the claimant's failure to quit smoking in discrediting her subjective complaints.)

Looking to the record, substantial medical evidence supports the ALJ's finding that Hayes's exertional and nonexertional impairments were not disabling, and that she had the RFC to perform the full range of sedentary work. The ALJ was not required to call a vocational expert.

**Weighing Medical Testimony**

The ALJ has the role of resolving conflicts among the opinions of various treating and examining physicians. Pearsall v. Massanari, 274 F.3d 1211, 1219 (8th Cir. 2001). The ALJ may reject the conclusions of any medical expert, whether hired by the government or claimant, if they are inconsistent with the record as a whole. Id. Normally, the opinion of the treating physician is entitled to substantial weight. Casey, 503 F.3d at 691. The opinion of a consulting physician, who examines a claimant once, or not at all, generally receives very little weight. Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000).

Still, the opinion of the treating physician is not conclusive in determining disability status, and must be supported by medically acceptable clinical or diagnostic data. Casey, 503 F.3d at 691. The ALJ may credit other medical evaluations over the opinion of a treating physician if the other assessments are supported by better or more thorough medical evidence, or when the treating physician's opinions are internally inconsistent. Guilliams v. Barnhart, 393 F.3d 798, 803 (8th Cir. 2005); Cantrell v. Apfel, 231 F.3d 1104, 1107 (8th Cir. 2000). In determining how much weight to give a treating physician's opinion, the ALJ must consider the length of the treatment relationship and the frequency of examinations. Casey, 503 F.3d at 692.

Hayes argues the ALJ should have given controlling weight to the mental and physical RFC determinations of Dr. Turner and DiValerio. In each case though, the doctors' RFC determinations were inconsistent with their treatment notes. In completing the RFC questionnaire, Dr. Turner believed Hayes lacked the mental abilities and aptitudes to perform semi-skilled or skilled work. He also believed Hayes would be unable to complete a normal workday. Yet, in his examinations, Dr. Turner noted Hayes was intelligent, oriented, had normal memory and insight, had good judgment, and her speech was coherent and spontaneous. She had

no hallucinations, no homicidal or suicidal thoughts, was sleeping well, and her GAF score corresponded to moderate symptoms. Beyond these internal inconsistencies, Dr. Singer noted that Hayes's impairments were not severe, and that Hayes was not even alleging psychiatric problems. Dr. Paranjothi and Dr. DiValerio also found Hayes oriented during their examinations.

In completing the RFC questionnaire, Dr. DiValerio found Hayes had fatigue and joint pain in the feet, hands, elbows, and right shoulder. He also believed she could never lift ten pounds or more, and could not use her fingers or hands for more than ten percent of the day. Yet, in his examinations, Dr. DiValerio found Hayes had no swelling, tenderness, or warmth in the hands, wrists, elbows, shoulders, hips, knees, ankles, or feet. Beyond these internal inconsistencies, Hayes herself testified at the hearing that she was able to lift ten pounds. Finally, Dr. Greenberg found Hayes had normal grip strength and was able to pick up coins with her hands.

Looking to the medical record, and in light of these internal inconsistencies, the ALJ properly weighed the medical testimony.

**Recontacting Treating Physicians**

Hayes argues the ALJ should have recontacted the treating physicians if he found ambiguities in their opinions. Looking to the federal regulations, 20 C.F.R. § 404.1512(e), the ALJ was not required to recontact Dr. Turner and Dr. DiValerio.[29] See Hacker v. Barnhart, 459

_____

[29]20 C.F.R. § 404.1512(e) states, in relevant part,

Recontacting medical sources. When the evidence we receive from your treating physician or psychologist or other medical source is inadequate for us to determine whether you are disabled, we will need additional information to reach a determination or a decision. To obtain the information, we will take the following actions.

(1) We will first recontact your treating physician or psychologist or other medical source to determine whether the additional information we need is readily available. We will seek additional evidence or clarification from your medical source when the report from your medical source contains a

(continued...)

F.3d 934, 938 (8th Cir. 2006).  The regulations do not require an ALJ to recontact a treating physician whose opinion was contradictory or unreliable.  Id. (citing 20 C.F.R. § 404.1512(e)).  The duty to recontact a medical source is triggered when the evidence is insufficient to make an informed determination -- not when the evidence is insufficient to make a favorable determination.  Pearson v. Barnhart, No. 1:04-CV-300, 2005 WL 1397049, at *4 (E.D. Tex. May 23, 2005).  Under the regulations, "[t]he ALJ is required to recontact medical sources . . . only if the available evidence does not provide an adequate basis for determining the merits of the disability claim. Sultan v. Barnhart, 368 F.3d 857, 863 (8th Cir. 2004); see also Thomas v. Barnhart, 278 F.3d 947, 958 (9th Cir. 2002).  The ALJ is not required to seek additional clarifying statements from a treating physician unless a crucial issue is undeveloped.  Goff, 421 F.3d at 791.

In this case, the available evidence in the record provides an adequate basis for determining the merits of the disability claim.  As noted above, substantial medical evidence supports the ALJ's RFC determination and the conclusion that Hayes's physical and mental impairments are not disabling.  Despite the internal inconsistencies, the ALJ did not err by failing to recontact either Dr. Turner or Dr. DiValerio.  See id. (Where the ALJ finds a physician's opinion inconsistent with other substantial evidence, the "ALJ may discount [that] opinion without seeking clarification.").

**Unemployment Benefits**

In the decision, the ALJ noted that Hayes's receipt of unemployment benefits after the alleged onset date was a factor cutting against her alleged disability.  Hayes argues the ALJ placed too much emphasis on

---

[29](...continued)
conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques.  We may do this by requesting copies of your medical source's records, a new report, or a more detailed report from your medical source, including your treating source, or by telephoning your medical source.

the receipt of unemployment benefits.  She also argues that the receipt of unemployment benefits does not necessarily preclude a finding of disability.

The ALJ properly considered Hayes's receipt of unemployment benefits.  "Applying for unemployment benefits may be some evidence, though not conclusive, to negate a claim of disability." <u>Johnson v. Chater</u>, 108 F.3d 178, 180-81 (8th Cir. 1997); <u>see also</u> <u>Salts v. Sullivan</u>, 958 F.2d 840, 846 n.8 (8th Cir. 1992) ("[I]t is facially inconsistent for [a claimant] to accept unemployment compensation while applying for social security benefits.").  Hayes's receipt of unemployment compensation was just one of several factors the ALJ considered in denying benefits.  Indeed, the ALJ limited his discussion of the topic to one paragraph in a nine-page opinion.  Under <u>Johnson</u>, the ALJ did not place too much emphasis on Hayes's receipt of unemployment compensation.  <u>Johnson</u>, 108 F.3d at 180-81.

## VI.  CONCLUSION

For the reasons set forth above, the decision of the Commissioner of Social Security is affirmed.  An appropriate order is issued herewith.


_____/S/  David D. Noce_____
**UNITED STATES MAGISTRATE JUDGE**


Signed on February 25, 2008.